**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 27 1999**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

MARILYN CRANER,

      Plaintiff-Appellant,

v.

THE NORTHWESTERN MUTUAL
LIFE INSURANCE COMPANY, dba
Northwest Mutual Life,

      Defendant-Appellee.

No. 98-4145
(D.C. No. 96-CV-1063-G)
(D. Utah)

---

**ORDER AND JUDGMENT**   *

---

Before **PORFILIO** , **BARRETT** , and **HENRY** , Circuit Judges.

---

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

---

\*     This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Plaintiff Marilyn Craner appeals the district court's grant of summary judgment in favor of defendant The Northwestern Mutual Life Insurance Co. (Northwestern). As plaintiff has not raised a genuine issue as to any material fact and Northwestern is entitled to judgment as a matter of law, we affirm.

On February 23, 1996, plaintiff's late husband, Stephen Craner, contacted a Northwestern agent to obtain life insurance. The agent informed Mr. Craner that he needed to undergo a medical examination as a prerequisite for coverage. On February 27, 1996, Mr. Craner underwent a medical examination, which included completing a medical questionnaire. In the questionnaire, Mr. Craner denied having been diagnosed with or treated for any psychological condition, including anxiety, depression, or stress, and denied consulting with any health care provider, including a psychologist, other than the health care providers already identified. Both of these answers were false, as Mr. Craner had been consulting with a psychologist on a weekly basis, and had been diagnosed with dysthymia, which is a form of depression.

The next day, Mr. Craner filled out an application for $500,000 in life insurance and paid the first month's premium. In return, he was given a "Receipt for Payment and Conditional Life Insurance Agreement," which contained the following provisions:

**I. Unacceptable Risks–No Insurance in Force.** No insurance or additional benefits will be in force at any time under the terms of this

Agreement if the proposed insured is not a risk acceptable to Northwestern Mutual Life on the Underwriting Date according to its rules and standards.

**II. Acceptable Risks–Insurance in Force.** The policy applied for will be in force as of the Underwriting Date if the proposed insured is a risk acceptable to Northwestern Mutual Life on the Underwriting Date for the policy applied for.

. . . .

**III. Underwriting Date–When Insurance Begins.** For acceptable risks insurance begins on the Underwriting Date, which is the later of:
A. The date of application ...; or,
B. the date of the nonmedical, paramedical or medical examination.

Appellant's App. at 38-39.

In addition, the front page of the Agreement stated in bold language that it was "**Not a 'Binder'–No Insurance if Section I Applies**," and the second page stated in bold lettering that the Agreement was "**NOT A 'BINDER'–NO AGENT MAY MODIFY THE TERMS OF THIS AGREEMENT–NO INSURANCE IF SECTION I APPLIES**." Id.

On March 8, 1996, Mr. Craner participated in a telephone interview with a Northwestern representative. During this interview, Mr. Craner disclosed, for the first time, his psychological treatment. Also during this interview, he responded negatively when asked whether he had ever been convicted of violating a criminal law other than a traffic violation. Northwestern then attempted to contact the psychologist to obtain his treatment records. Although numerous attempts were

-3-

made to obtain the records, Northwestern did not receive the complete treatment information until May 6, 1996. The psychologist's records disclosed that Mr. Craner had been diagnosed with depression, and that he was being treated for, inter alia, several incidents of sexual activities with children. A follow-up investigation revealed that Mr. Craner had been convicted of lewdness with a child in November 1991, and that in 1996 he was facing three felony counts of sexual assault on a child.

On April 5, 1996, while Northwestern's investigation was still underway, Mr. Craner was killed in a one-car accident. On May 14, 1996, Northwestern determined that Mr. Craner was not an insurable risk as of the underwriting date, based on his recurrent psychological problems, his criminal conviction, and the pending criminal charges. Contemporaneously with its decision, Northwestern returned the first month's premium paid by Mr. Craner.

On November 18, 1996, plaintiff filed an action in state court against Northwestern and its agent, alleging breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent inducement, infliction of emotional distress, and negligent delay. The case was removed to federal court on diversity grounds. On March 6, 1997, the district court dismissed the complaint against Northwestern's agent, and on July 15, 1998, the court granted Northwestern's motion for summary judgment. The district court concluded that

(1) the conditional life insurance agreement was not ambiguous; (2) it contained a condition precedent requiring that Mr. Craner be determined an acceptable risk before the coverage would be effective; (3) Northwestern's determination that Mr. Craner was not an acceptable insurance risk was not arbitrary or capricious; and (4) plaintiff's remaining claims failed as a matter of law. Plaintiff appeals only the court's decision regarding her breach of contract claim.

We review a grant of summary judgment de novo, applying the same standard as the district court. See Siemon v. AT & T Corp., 117 F.3d 1173, 1175 (10th Cir. 1997). Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We examine the factual record and the inferences reasonably drawn therefrom in the light most favorable to the party opposing summary judgment. See Siemon, 117 F.3d at 1175.

Plaintiff argues that the conditional life insurance agreement was a temporary contract of insurance that covered Mr. Craner unless it was terminated by Northwestern before his death. Alternatively, plaintiff argues the agreement was ambiguous and should be construed in favor of coverage. We disagree with both these arguments.

Because this is a diversity case, we examine Utah law to determine the meaning and effect of the agreement. See Novell, Inc. v. Federal Ins. Co., 141

F.3d 983, 985 (10th Cir. 1998) (holding in diversity case that insurance contract would be interpreted pursuant to Utah law). When an applicant completes a life insurance application and tenders the first premium, Utah law recognizes two different relationships that may be created between the applicant and the insurer. If the insurer issues a "binder" or a "binding receipt," and manifests an intention to provide immediate coverage subject to certain conditions, a temporary insurance contract is created. See Long v. United Benefit Life Ins. Co., Inc., 507 P.2d 375, 376-77 (Utah 1973) (holding temporary insurance in effect when agent advised applicant he was insured from time he signed application; receipt for first premium did not say it was "conditional"; there was no evidence applicant was not insurable; and receipt stated insurance was effective on date of application subject to certain conditions); Phoenix Indem. Ins. Co. v. Bell, 896 P.2d 32, 35-36 (Utah Ct. App. 1995) (noting "'binder' is a term of art in the insurance industry for a temporary contract for insurance"). Such temporary insurance may be terminated only when the application is rejected and the applicant is given notice of the rejection. See Long, 507 P.2d at 379; Stevenson v. First Colony Life Ins. Co., 827 P.2d 973, 978 (Utah Ct. App. 1992).

If, however, the insurer issues a conditional receipt stating clearly that no insurance will take effect unless certain conditions are met, in particular the condition of insurability, Utah courts will not find coverage if the condition

precedent is not satisfied. See Wade v. Utah Farm Bureau Ins. Co., 700 P.2d 1093, 1095-96 (Utah 1985) (holding that condition precedent to coverage was not fulfilled when applicant's death before the medical exam "made it impossible to learn whether she was an insurable risk"); Williams v. First Colony Life Ins. Co., 593 P.2d 534, 537 (Utah 1979) (holding coverage not effective under plainly-worded conditional receipt when applicant died before conditions met, stating "the insurer should be accorded the protection of the plainly stated provisions of its contract as to the conditions prerequisite to its providing insurance coverage"); Winger v. Gem State Mut. of Utah, 449 P.2d 982, 982-83 (Utah 1969) (holding no insurance coverage when insurer acted with reasonable dispatch in determining applicant was not insurable, and "conditional receipt" clearly conditioned coverage on determination that applicant was insurable according to insurer's rules and practices); see also Machinery Center, Inc. v. Anchor Nat'l Life Ins. Co., 434 F.2d 1, 5-6 (10th Cir. 1970) (construing Utah law to enforce plainly written condition precedent in conditional receipt, and distinguishing between binders and conditional receipts).

In Prince v. Western Empire Life Ins. Co., 428 P.2d 163 (Utah 1967), the Utah Supreme Court described the effect of a receipt conditioning coverage on insurability as follows:

> Where a binding receipt is issued to the applicant with a provision
> that the insurance be binding from the date of the application or the

-7-

medical examination if the insurance company is satisfied that the applicant was an insurable risk at that time, the general rule is that a contract of preliminary insurance is created with the reserved right in the insurer to determine in good faith the applicant's insurability. Hence if, at the time of the application or medical examination, the insured was an insurable risk, the temporary contract of insurance is in force[.] If, however, the applicant at the time of the application or the medical examination was not an insurable risk, the company will not be liable under the 'binding receipt.' The rationale behind this holding is simply that the language of the receipt clearly expresses the intention of the parties.

Id. at 167. The court in Prince found coverage because the receipt was labeled "binding receipt," there was proof that the applicant was an insurable risk, and both parties intended that the insurance would take effect before the applicant's other insurance lapsed. See id. at 166-67.

Moreover, the distinction between these two types of receipts and their effects appears to be codified by statute in Utah. Section 31A-21-102(1) of the Utah Insurance Code provides:

"Binder" means a writing which describes the subject and amount of insurance and temporarily binds insurance coverage pending the issuance of an insurance policy. "Binder" does not include conditional receipts by life insurance companies under which issuance of the policy or coverage under the policy is contingent upon the acceptability of the risk to the insurer.

Utah Code. Ann. § 31A-21-102(1) (1999 Repl.).

In the case before us, the conditional receipt very clearly stated that insurance coverage was conditioned on Mr. Craner's insurability as of the date of underwriting. There is nothing ambiguous about Northwestern's language, which

emphasized, and later reemphasized, that coverage would not become effective if the applicant was not an insurable risk when he completed the application or the medical examination, whichever occurred later. Based on the Utah statute and case law, we hold that the district court correctly interpreted the receipt to preclude coverage ab initio when Northwestern determined Mr. Craner was not an acceptable risk. As no temporary insurance was created, plaintiff is not entitled to benefits under the policy. [1]

Plaintiff attempts to recast Northwestern's rejection of the risk as the insurer's termination of Mr. Craner's temporary insurance based on his misrepresentations. She then argues that such a termination was based on his failure to satisfy a condition subsequent, and that, therefore, the temporary coverage was still in effect when he died. The record does not support this

---

[1]    In an attempt to place herself within the factual situation of Long v. United Benefit Life Ins. Co., plaintiff misrepresents the insurance agent's testimony, stating "Lambert [the insurance agent] advised Craner at the time of delivery of the Conditional Receipt that coverage existed from that time forward unless later terminated." Appellant's Br. at 7. The referenced testimony actually states that the agent "explained to him that *if Mr. Craner was an acceptable risk to Northwestern Mutual on the underwriting date*, as explained here, *that his coverage would take effect* on the later of the signing of the application or the dating of the medical exam; and that [the signed application, completed medical exam, and premium payment] created a conditional life insurance amount that would be payable *if he were an acceptable risk* to Northwestern Mutual." Appellant's App. at 93, Depo. p. 43:8-17 (emphasis added). No coverage was created, therefore, by the agent's statements to the applicant about the effective date of coverage.

reading, however. Because Northwestern did not rely on Mr. Craner's misrepresentations to decline coverage, the district court did not address the propriety of terminating coverage on this basis, and neither will we.

The judgment of the United States District Court for the District of Utah is AFFIRMED.

Entered for the Court


James E. Barrett
Senior Circuit Judge